Filed 5/26/26  P. v. Perelman CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>KEVIN PERELMAN,<br><br>    Defendant and Appellant. | B343120<br><br>(Los Angeles County<br>Super. Ct. No. LA099813) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gregory A. Dohi  Judge.  Reversed and remanded.

Yisrael Gelb, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and David A. Voet, Deputy Attorneys General, for Plaintiff and Respondent.

Kevin Perelman appeals his conviction on two counts of vandalism. He contends the trial court prejudicially erred in admitting evidence of surveillance video recordings of both incidents, arguing that the videos were not properly authenticated. He also argues that the trial court erred in sentencing him to mandatory supervision for his misdemeanor conviction. We find no error in the court's admission of evidence. However, we agree there was sentencing error. We therefore reverse the judgment and remand for resentencing.

## PROCEDURAL HISTORY

Appellant was charged with three counts of vandalism under Penal Code section 594, subdivision (a).[1] Count one charged appellant with felony vandalism of a vehicle owned by Pedram Ezadpana, count two alleged felony vandalism of a vehicle owned by Terrance Scroggin, and count three alleged misdemeanor vandalism to a wall.

A jury found appellant guilty on counts two and three. The jury hung on count one and the prosecution subsequently dismissed that count. The court sentenced appellant to a total of three years, with appellant ordered to serve 270 days in county jail and the remaining time on mandatory supervision. Appellant timely appealed.

## FACTUAL BACKGROUND

### I. Prosecution Evidence

The vandalism incidents at issue occurred in July 2023 at two locations in the Woodland Hills neighborhood of Los Angeles. The prosecution relied heavily on footage from surveillance cameras depicting the incidents, which was played for the jury at trial.

### A. July 11, 2023 incident (count three)

The first incident occurred at the Warner Plaza, a shopping center owned by Retail Opportunity Investments, Corp. (ROIC). Surveillance video timestamped 7:45 a.m. on July 11, 2023 showed a dark-colored SUV driving alongside some of the stores in the center. The SUV had "www.kevenperelmantarget.com" written on its side. The video showed someone dropping small pieces of paper, which turned out to be appellant's

---

[1] Undesignated statutory references are to the Penal Code.

business cards, from the car onto the ground.  The SUV parked near the back door of one of the restaurants.  The driver exited the vehicle, walked toward a wall of the shopping center, then returned to the SUV.  A second video taken from another camera angle showed the stopped SUV and the person marking the wall.  The prosecution also introduced a photograph showing two green fist-sized dots on the wall.

Officer Charles Dinse of the Los Angeles Police Department (LAPD) investigated the incident.  He requested the surveillance videos by email from April Sheffield, the property manager for ROIC.  He identified the videos at trial as the ones that Sheffield had emailed him and stated that the videos had not been modified since he received them.

Officer Dinse was familiar with appellant and identified him as the person shown in the video marking the wall.  He also recognized appellant's vehicle, with the name of appellant's website on the side, as the SUV shown in the videos.  Dinse testified to seeing this vehicle "a lot" while on patrol in the neighborhood.  Dinse was also familiar with appellant's business cards, like the ones thrown out of the SUV's window, because he had "collected many of them" from the ground over the years.  The cards also contained the website address "www.kevenperelmantarget.com."

Randy Christensen, ROIC operations manager, testified to authenticate the video.  He visits the shopping center about twice per week as part of his job.  He was familiar with the surveillance system, including the location of the cameras. Christensen testified that the cameras continually record, with the videos stored first onsite and then uploaded to a server run by the security monitoring company American Virtual Monitoring (AVM).  It was Christensen's understanding that the videos were encrypted so that they could not be tampered with.  When he received a request for surveillance videos, his usual practice was to pass the request along to Sheffield in the ROIC corporate office, who would then send the request to AVM.  Once Christensen received the files from AVM, he would forward them to the police.  He did not make the request for the files of this incident and had not seen the videos.  During his pre-trial testimony to establish foundation for the videos, Christensen testified that Sheffield told him she had gotten a request and sent the files to the LAPD.

Upon viewing the videos at trial, Christensen identified the relevant sections of Warner Plaza as an accurate depiction of those locations. He was familiar with appellant's business cards, as he had found them on other occasions lying on the ground throughout the property. Christensen took the photo of the green dots on the wall. He took the photo when he first saw the dots, about three days after the incident. He had not seen any green dots in that location when he last visited the property a few days before the incident.

## B.      July 31, 2023 incident (counts one and two)

The second incident involved the vandalism of two cars on July 31, 2023 at the Woodland Oaks complex. The complex includes townhomes and condominiums, with separate parking garages for each. Count one, on which the jury hung, involved vandalism to a vehicle owned by resident Pedram Ezadpana parked in one of the garages. Count two involved vandalism to a vehicle owned by resident Terrance Scroggin, parked in another complex garage. The prosecution played surveillance footage at trial from several different cameras at the complex.

The first video was timestamped July 31, 2023 at 5:54 p.m. It showed the elevators at Woodland Oaks leading to one of the parking garages. The video showed a man getting out of the elevator and opening the door to the parking garage. The second video, timestamped a few seconds later, showed an area of the parking garage with the same door. This video showed a man walk from the door into the garage, then approach a vehicle parked in the space assigned to Ezadpana.

Ezadpana, who had lived in the complex for the past year, identified the man in the videos as appellant. He recognized the elevator, garage, and his car parked in his space in the videos. Ezadpana next saw his car around 11:00 the following morning and noticed new scratches in the paint on the right side of the vehicle.

Another video showed a different parking garage on the property, with the timestamp of July 31, 2023, at 5:28 or 5:29 p.m.[2] The video showed a person entering the garage and walking to the side of a vehicle parked in a

---

[2]      Witness Shauna Gatlin testified that she was not sure of the last digit of the timestamp because it appeared "smushed." She later explained that the timestamp appeared in smaller type and was therefore harder to read.

space assigned to Terrance Scroggin.  The person made a motion as if drawing an asterisk on the hood of the car.

Scroggin, a longtime resident in one of the townhomes, has known appellant as another townhome resident for more than 20 years.  He testified that all of the videos depicted a fair and accurate representation of the complex as of July 2023 and he also identified appellant in the videos.  Scroggin identified his car as the one appellant approached.  He parked his car in his spot on July 31.  When he came back the next day, he found a large asterisk mark on his hood, an "X" mark on his trunk, and key scratches down both sides of the car, none of which had been there before.

Scroggin identified a photo of his car showing the asterisk damage and another "X" mark, noting that the scratches were cut deeply into the paint.  He testified that the video showed appellant using a key to scratch the asterisk into his car hood.  However, the videos did not show appellant scratching any other parts of his car.  After he found the damage, he reported it to the president of the Homeowners' Association (HOA), Steven Bear.

Additionally, Scroggin testified about an earlier incident in which he told appellant to stop putting business cards on car windshields and appellant responded by threatening to cut him open.  Scroggins stated that appellant often threw his business cards from his car window all over the street.

The prosecution introduced several witnesses to authenticate the Woodland Oaks videos. Shauna Gatlin, the property manager, testified that she visited the property every three to six months.  She described the video surveillance system, including the location of the cameras and the storage of the recorded videos on several DVRs onsite.  After she received calls from community residents regarding the July 31 incident, she requested that Bear retrieve the videos corresponding to the date and time of the incident.  She made the request to Bear because he had software on his computer that allowed him to access the property's surveillance footage.  Bear played the surveillance footage on his laptop and used his cellphone to record a video of that video.  Bear then sent the cellphone video to Gatlin.

After Gatlin received the footage from Bear on August 2, 2023, she reviewed it and testified that it corroborated what the residents had reported.

She then emailed the videos to Officer Dinse the same day. Gatlin confirmed that the locations in the videos were a fair and accurate depiction of the complex and were the same videos she had sent to the LAPD. She had no reason to believe the timestamps would be inaccurate.

Gatlin was generally familiar with how the surveillance video software worked, as she had used it for this property and others she managed. She did not believe the software had the ability to alter the footage, but could not say for certain. She did not believe that Bear would have any reason to alter the videos. The original videos from July 31 would have been overwritten after 45 days, in accordance with their general retention policy.

Bear testified that he was a longtime resident of the complex and had been president of the HOA board of directors for many years. He described the property's video recording system, including the location of the cameras. According to Bear, the cameras are triggered by motion and the recordings are stored automatically on DVR recorders for 45 days.

As of July 31, 2023, Bear was getting complaints of cars being keyed and vandalized in both complex garages. Woodland Oaks has a security consultant who can pull and copy the recordings, but because of the complaints, Bear decided it would be faster for him to play the footage on his computer, record that on his phone, and send it to Gatlin. He would often pull footage after receiving a request from the property manager. This was the only time he recorded the video onto his phone, instead of requesting a copy. He recalled that the security person who would normally handle these requests was out of the country at the time.

Bear identified the videos as the ones he pulled, recorded, and sent, and testified that he did not alter them. In his experience as HOA president since 2016, sometimes one of the cameras might have the timestamp off by a few minutes following a power outage, but otherwise they were accurate. Bear identified appellant as the individual in each video, whom he knew from seeing him around the complex for many years. The videos accurately depicted the property as it was on July 31, 2023.

Officer Dinse also investigated the Woodland Oaks incident. He testified that he received the surveillance videos from Gatlin and he did not alter them. He identified appellant as the individual in the videos.

## II. Defense Evidence

Appellant did not testify or call any witnesses.

## DISCUSSION

## I. Admission of Videos

Appellant contends the trial court erred in overruling his objections to foundation and chain of custody and admitting into evidence the videos depicting both incidents. We find no abuse of discretion.

### A. Relevant Background

Prior to trial, the prosecution presented Christensen's testimony, which largely mirrored the testimony he gave at trial, as the foundation for the videos supporting count three. The prosecutor also presented an offer of proof that Officer Dinse would testify that he received the video from Sheffield.

Defense counsel argued that this testimony was insufficient to authenticate the video or establish chain of custody. The prosecutor responded that Christensen could view the video during his testimony and confirm that it was generally accurate. The court concluded, "[s]hort of any suggestion that somehow the security company tampered with its video or that the police somehow tampered with it, this seems the testimony of someone who's familiar with the system in general, who was involved at some stage in getting the video for the police, while not ideal, is definitely supportive of the necessary chain of custody and authentication requirements." The court thus overruled appellant's objections, finding that testimony from Officer Dinse and Christiansen was sufficient to establish chain of custody and authentication of the Warner Plaza videos.

With respect to the videos from Woodland Oaks supporting counts one and two, after Gatlin testified at trial that she received from Bear a cellphone recording of the original video, defense counsel again raised foundation objections. The court noted that the situation was more complicated than it had previously appeared and indicated that it did not seem the videos would be admissible without testimony from Bear.

After Bear testified, defense counsel renewed his objections to the videos. The court overruled the objections, finding that the "proper chain of custody has now been established. Mr. Bear described how he got this

7

footage and what he did with it, and on the receiving end, I take it that the officer [who had not yet testified] would say that his is the footage that he got."

At the close of evidence, defense counsel again objected based on chain of custody and authentication to admission of all of the videos. The court overruled the objections. As to chain of custody, the court reasoned that Officer Dinse testified about where he received all of the videos. For the Warner Plaza videos, the court found that although Sheffield did not testify, Christiansen "testified as to standard of practice. He recognized the videos." For the Woodland Oaks videos, the court found it sufficient that "Mr. Bear testified as to the videos that he obtained, and how he recorded them off the screen, and what software he used."

## B.    Authenticity
### 1.    *Legal Framework*

"Photographs and video recordings with imprinted data are writings as defined by the Evidence Code." (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266 (*Goldsmith*), citing Evid. Code, § 250.) To be admissible in evidence, a writing must be relevant and authenticated. (Evid. Code, §§ 350, 1401.)

"Authentication is to be determined by the trial court as a preliminary fact ([Evid. Code] § 403, subd. (a)(3))," so that before a writing may be admitted into evidence, the party seeking to introduce the writing must provide evidence that would permit a reasonable trier of fact to find the "writing is what it purports to be, i.e., that it is genuine for the purpose offered." (*Goldsmith, supra*, 59 Cal.4th at p. 267.) As the *Goldsmith* court explained, "[e]ssentially, what is necessary is a prima facie case. 'As long as the evidence would support a finding of authenticity, the writing is admissible. The fact conflicting inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility.'" (*Ibid.*, quoting *Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 321.)

"A photograph or video recording is typically authenticated by showing it is a fair and accurate representation of the scene depicted." (*Goldsmith, supra*, 59 Cal.4th at p. 267.) The necessary proof "varies with the nature of the evidence that the photograph or video recording is being offered to prove and with the degree of possibility of error." (*Ibid.*) ["We have long approved

8

the substantive use of photographs as essentially a 'silent witness' to the content of the photographs."].)  The requisite authentication "may, but need not be, supplied by the person taking the photograph or by a person who witnessed the event being recorded.  [Citations.]  It may [also] be supplied by other witness testimony, circumstantial evidence, content and location." (*Id.* at p. 268; see also *People v. Marshall* (1996) 13 Cal.4th 799, 832; *People v. Valdez* (2011) 201 Cal.App.4th 1429, 1432.)

We review the court's determination of authenticity for abuse of discretion.  (See *Goldsmith, supra*, 59 Cal.4th at p. 266.)  Under this standard, "we will not disturb the trial court's ruling 'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*Ibid.*, quoting *People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

### 2. *Analysis*

Appellant argues that the prosecution presented insufficient evidence to meet its burden to authenticate the videos.  We find no abuse of discretion in the trial court's rejection of this argument.

The prosecution presented evidence that would allow a reasonable jury to find that the videos were authentic.  At both locations, individuals familiar with the property and with the general video collection procedures testified that as to the process of collecting and obtaining the videos and confirmed that the videos accurately reflected the property at the time of the incident.  The witnesses testified as to the automatic recording of the surveillance footage and its storage on a server maintained by a security company (for Warner Plaza), or a dedicated DVR onsite with limited access (for Woodland Oaks).  Officer Dinse also confirmed receiving the videos by email from both locations and confirmed that the videos shown in court where the same ones he received.  The timestamps on each video corresponded to the reported incidents, further supporting a finding that the videos were authentic.

Additional evidence also supported the admission of the videos as evidence of the truth of their contents.  Multiple witnesses who were familiar with appellant consistently identified him as the individual in the videos.  Witnesses also recognized appellant's car, visibly emblazoned with his website, and confirmed that they had previously seen appellant throwing his

business cards on the ground in the same manner shown on the video from Warner Plaza. A few days after the July 11 incident, Christensen found appellant's business cards on the ground of the plaza, matching the cards strewn about in the video from that location. Christensen also found and photographed the graffiti in the location where appellant had been standing and moving his hand a few days before. Similarly, Scroggin found an asterisk carved into the hood of his car the morning after the video showed appellant making consistent hand motions over Scroggin's hood. This evidence further supported the trial court's finding that the prosecution met its burden to authenticate the videos. (See *Goldsmith, supra*, 59 Cal.4th at p. 271 ["the content of the photographs themselves may be considered and here the content supplied further support for a finding that the images were genuine"].)

Appellant contends *People v. Beckley* (2010) 185 Cal.App.4th 509 (*Beckley*) set forth a bright line rule that photo and video evidence "must either be authenticated by the taker of the photo, a witness to the scene, or an expert testifying that the video and image is what it purports to be and that it was not tampered with." We disagree that *Beckley* supports any such bright line rule. The appellate court found that evidence from one of these three categories would be sufficient to authenticate a photograph, as would "any other evidence sufficient to sustain a finding that it is the photograph that the prosecution claims it is." (*Id.* at p. 515.)

Moreover, to the extent *Beckley* can be read as appellant suggests, our Supreme Court in *Goldsmith* expressly distinguished *Beckley* and rejected the argument that expert testimony was necessary for authentication. (*Goldsmith, supra*, 59 Cal.4th at p. 272, fn. 8; see also *ibid.* ["We decline to require a greater showing of authentication for the admissibility of digital images merely because in theory they can be manipulated."]; *In re K.B.* (2015) 238 Cal.App.4th 989, 997 ["reading *Beckley* as equating authentication with proving genuineness would ignore a fundamental principle underlying authentication emphasized in *Goldsmith*"].) The other cases appellant cites further confirm that circumstantial evidence can establish foundation, even absent expert testimony. (See *People v. Cruz* (2020) 46 Cal.App.5th 715, 731 [distinguishing *Beckley* and holding that "circumstantial evidence, coupled

10

with the contents of the messages, made a prima facie showing that the Facebook messages to Jane were sent by defendant"]; *People v. Valdez* (2011) 201 Cal.App.4th 1429, 1436 [distinguishing *Beckley* and holding that the content of the photograph and the rest of the defendant's password-protected website was sufficient to authenticate the photo].)

We also find *Beckley* factually distinguishable. *Beckley* involved the admission of a photograph showing a witness making a gang sign for impeachment purposes. (*Id*. at p. 514.) A detective testified that he downloaded the photograph from a defendant's page on the social media website MySpace. (*Ibid*.) The court observed that digital photographs could be altered and "'[a]nyone can put anything on the Internet.'" (*Ibid*.) As such, without testimony from someone with personal knowledge that the photograph was accurate or from an expert that the picture was not a composite or faked, the court concluded it was not properly authenticated. (*Id*. at pp. 515-516.) Here, on the other hand, the prosecution offered evidence showing that the videos were recorded for surveillance purposes and automatically stored on devices maintained by a security company or by a few individuals at the property complex. The videos bore a timestamp and accurately depicted the surroundings shown. Thus, the concerns discussed in *Beckley* regarding the ability of any unknown actor to generate a false internet image are not present here.

Additionally, we disagree with appellant that the authentication requirements should be more stringent because there was "evidence of tampering" due to Bear's actions in re-recording the videos with his cell phone and Gatlin's statement that one timestamp was "mushy." Appellant cites no authority to support this contention. Each witness explained their actions and testified that they did not alter the videos. Gatlin explained that her reference to the timestamp as "smushed" meant that it was harder to read than some of the other videos; she did not suggest any tampering or alteration. It was up to the jury to determine the weight to give to this testimony. Notably, defense counsel did not argue during trial that any of the videos appeared to have been altered. Instead, he contended that the videos did not clearly identify appellant or show that appellant caused any of

the alleged damage.  As such, the trial court did not abuse its discretion by admitting the video evidence.[3]

### C.     Chain of custody

We are similarly unpersuaded by appellant's contention that the prosecution failed to establish a proper chain of custody for the videos.  We review a trial court's chain of custody determination for an abuse of discretion.  (*People v. Catlin* (2001) 26 Cal.4th 81, 134.)

"'While a perfect chain of custody is desirable, gaps will not result in the exclusion of the evidence, so long as the links offered connect the evidence with the case and raise no serious questions of tampering.'"  (*People v. Catlin, supra,* 26 Cal.4th at p. 134.)  Here, as we have discussed, the court did not abuse its discretion in finding that the evidence adequately connected the evidence and that there was no indication the videos had been tampered with.

Appellant also asserts that the only evidence that Sheffield sent the videos to the LAPD was the hearsay testimony by Christiansen that Sheffield had told him she had done so.  The court overruled defense counsel's objection, finding that Christiansen's testimony was relevant to establish "custom and practice and habit."  Other than pointing out that the statement was hearsay, appellant does not explain how the court's ruling was in error or even argue that the hearsay statement was inadmissible.  We therefore need not address it further.  (See *Julian v. Hartford Underwriters Ins. Co.* (2005) 35 Cal.4th 747, 761, fn. 4 ["We decline to advance an argument . . . neither timely nor fully made."].)

## II.    Sentencing

Appellant contends that by imposing a "split" sentence pursuant to section 1170, subdivision (h)(5)(B) (section 1170(h)(5)(B)), the trial court improperly included a term of mandatory supervision for his misdemeanor conviction.  We agree that we must reverse and remand for resentencing.

---

[3]     Similarly, we reject appellant's assertion, which he did not raise below, that the Woodland Oak videos should be excluded because the originals were destroyed.  Appellant has forfeited this argument by failing to raise it before the trial court.  (See, e.g., *Bhatt v. State Dept. of Health Services* (2005) 133 Cal.App.4th 923, 933.)

### A.	Background

During the sentencing hearing, the court explained its concern that, "if I deny probation, I won't be able to issue the protective orders [protecting other condominium residents] that I think would be appropriate in a case such as this.  If I grant probation Mr. Perelman might not receive the custody time that I think would be appropriate."  Instead, the court considered "splitting" the sentence, so that appellant would serve "a certain amount of time in custody," then remain "under court-mandated probationary supervision for the rest of that time," thus imposing a sentence that was "halfway between granting probation and denying it and sentencing to you [*sic*] straight custody."  The court thus sentenced appellant to "a total of three years and I'm going to split it. . . .  [¶] I'm going to require you to serve 270 days in the county jail and the balance of the sentence is going to be mandatory supervision."

The original minute order from the sentencing hearing stated that probation was denied on both counts two and three and that the sentence on count two was imposed pursuant to section 1170, subdivision (h).  The minute order further provides, "Defendant on Mandatory Supervision/Committed to County Jail."  However, a subsequent nunc pro tunc order reflected that appellant was placed "on 2 years formal probation."

### B.	Legal Framework

Under the Realignment Act, qualifying low-level felony offenders "no longer serve their sentences in state prison.  Instead, such offenders serve their sentences either entirely in county jail or partly in county jail and partly under the mandatory supervision of the county probation officer." (*People v. Scott* (2014) 58 Cal.4th 1415, 1418-1419, citing § 1170, subd. (h)(2), (3), (5).)  Pursuant to section 1170(h)(5)(B), the court has discretion to impose a hybrid sentence consisting of county jail followed by a period of mandatory supervision. (*People v. Scott, supra,* 58 Cal.4th at p. 1418.; see also *People v. Catalan* (2014) 228 Cal.App.4th 173, 178.)  This option is only available for felony convictions.  (§ 1170, subd. (h).)

### C.	Analysis

Because the record of appellant's sentence contains inconsistencies, particularly references to both probation and mandatory supervision, the

parties dispute what type of sentence the trial court imposed.  Appellant argues that the court split the total three-year sentence under section 1170(h)(5)(B), thus imposing 270 days (out of the two years for the felony) jail time, then mandatory supervision for the remainder of the sentence on both counts.  Because mandatory supervision under section 1170(h)(5)(B) is not available for a misdemeanor, appellant argues that we should strike the 364 days of supervision imposed for the misdemeanor.

Respondent acknowledges the lack of clarity in the sentencing orders, but argues that the record supports the conclusion that the court did not impose a hybrid sentence pursuant to section 1170(h)(5)(B).  Instead, respondent asserts the court imposed 270 days of jail time for the misdemeanor, which matches the full 364-day sentence imposed on count three, minus the 94 days of custody credit awarded.  Respondent further contends that the court imposed the full two-year sentence on count two as probation, as reflected in the nunc pro tunc order.

The record does not support respondent's contention that the court ordered formal probation.  As reflected in the court's oral pronouncement and the corresponding minute order, the court "split" the total three-year sentence for both counts, imposing 270 days of jail time and the balance as mandatory supervision.  While respondent points to the subsequent nunc pro tunc order purporting to place appellant on two years of formal probation, a nunc pro tunc order is "generally limited to correcting clerical errors" and " 'cannot declare that something was done which was not done.'" (*People v. Borja* (2002) 95 Cal.App.4th 481, 485, quoting *Johnson & Johnson v. Superior Court* (1985) 38 Cal.3d 243, 256.)

The record indicates that at least some portion of the court's order imposing mandatory supervision applied to the misdemeanor conviction.  As mandatory supervision under section 1170(h)(5)(B) is only applicable to felony convictions, we must remand for resentencing.

## DISPOSITION

The judgment is reversed and remanded for resentencing.


COGLIATI, J*.


We concur:


ZUKIN, P. J.


MORI, J.

---

*      Judge of the Santa Cruz Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.